DRYFOOS ET UX. *v.* HOSTETTER..ET AL.

[No. 210, September Term, 1972.]

*Decided March 27, 1973.*

*Motion for rehearing filed April 26, 1973; denied May 7, 1973.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Edwin Collier,* with whom were *Collier & Shaffer* on the brief, for appellants and cross appellees.

*Josef B. Brown,* with whom were *Reichelt, Nussbaum & Brown* on the brief, for appellees and cross appellants Hostetter et al.

*George F. Paxton* for appellees Suburban Home Investment Corporation and Fellowship Investment Associates et al.

SINGLEY, J., delivered the opinion of the Court.

On 20 April 1967, J. Virgil Hostetter and Lois G.

Hostetter, his wife (the Hostetters) sold certain unimproved property in Prince George's County to Henry Dryfoos, III and Pauline Webb Dryfoos, his wife (the Dryfooses). Of the total purchase price, $40,000.00 was deferred, the note received by the Hostetters representing that amount being secured by a purchase money deed of trust to Paul M. Nussbaum and Herbert W. Reichelt, trustees.

The deed of trust from the Dryfooses to Nussbaum and Reichelt, as trustees, contained the following provision, the significance of which will be later discussed:

"IT BEING EXPRESSLY UNDERSTOOD AND AGREED that upon the recordation of any bona fide construction loan or loans secured on the hereafter described property, the Lien of this Instrument shall become subordinate to such construction loan or loans and to any and all advances made thereunder, whether such advances are pursuant to a firm commitment or voluntarily made."

On 14 February 1969, the Dryfooses sold the same property to B. A., Inc. (B. A.) for $80,000.00, including, however, the purchase money debt of $40,000.00 owed the Hostetters to which the property remained subject. Of the remainder of the purchase price, $18,000.00 was deferred, represented by a note payable to the Dryfooses secured by a deed of trust from B. A. to Edwin Collier and Francis A. Shaffer, as trustees.

At this brief instant, the Hostetters were secured by the senior encumbrance on the property; the Dryfooses, by the junior.

On the day the transaction was closed, B. A. gave Suburban Home Investment Corporation (Suburban) a note for $50,000.00. The note given Suburban was secured by a deed of trust from B. A. to G. Patricia Colicchio and Charles E. Mitchell, as trustees. Only $22,000.00 appears to have been paid in cash to the Dry-

fooses from the loan proceeds, the $18,000.00 Dryfoos trust and the $40,000.00 Hostetter trust rounding out the balance of the $80,000.00 contract price.

It would seem that while the Suburban loan was in the face amount of $50,000.00, B. A.'s note was sold by Suburban to Fellowship Investment Associates (Fellowship) for $42,500.00, subject, however, to a commission of $4,200.00 paid by B. A. to Suburban, and the deduction of $1,875.00 as prepaid interest, but here the record becomes cloudy. It appears to be conceded, however, that Berks Title Insurance Company, as agent for B. A., received only $30,625.00 of the $50,000.00 which B. A. had borrowed, and that even this sum was paid it by Fellowship, and not by Suburban. The balance of something over $5,000.00 was disbursed by Suburban to B. A's president, or on his order.

Two difficulties underlay the whole transaction. The first was that Nussbaum, trustee under the deed of trust securing the obligation to the Hostetters, several days preceding the closing, had joined with his fellow trustee, Reichelt, with Hostetter's approval, in the execution of an agreement which had the effect of subordinating the Hostetter obligation to the Suburban loan, primarily because Mr. Hostetter had been advised by his counsel that the Hostetter trust provided for subordination to a construction loan, and Hostetter was under the impression that Suburban was making such a loan.

Unhappily, however, the subordination agreement which Nussbaum and Reichelt signed on 10 February 1969 specifically subordinated the lien of the Hostetter deed of trust to that of a deed of trust to be executed. The agreement contained no reference to the provision that the lien of the Hostetter trust was only to be subordinated to a construction loan, nor any representation that a lender was, in fact, making a construction loan. The form of subordination agreement submitted to Nussbaum and Reichelt for signature contained the name of a different borrower and disclosed neither the date of

the deed of trust (which had not yet been prepared) nor the correct name of the borrower. This was later corrected by interlineation and insertion.

The second difficulty stemmed from the fact that by Ch. 718 of the Laws of 1968, effective 1 July 1968, the General Assembly had enacted what is now Maryland Code (1957, 1966 Repl. Vol., 1971 Cum. Supp.) Art. 21, § 30 (b) which required that the party secured by a purchase money deed of trust, if not the seller of the property, make an affidavit that the funds borrowed had been disbursed at the time the deed of trust was executed. The deed of trust from B. A. to Suburban, executed 14 February 1969, bore no affidavit of disbursement.

In July 1970, the Dryfooses having defaulted under their deed of trust, the Hostetters, Nussbaum and Reichelt filed an amended bill in equity in the Circuit Court for Prince George's County against B. A., Colicchio, Mitchell, Suburban, Fellowship and the Dryfooses, seeking to have Fellowship enjoined from foreclosing the deed of trust securing its note; asking that the subordination agreement be set aside and that the priority of the deed of trust securing the Hostetter obligation be reestablished.[1] The Dryfooses answered, agreeing to a grant of the claimed relief. Suburban and Fellowship filed answers generally denying the allegations of the bill.

Suburban and Fellowship countered with a third-party claim against Berks Title Insurance Company, alleging that Berks guaranteed that Suburban and any successor in interest would be secured by a first lien on the property, and that Berks would be liable to Suburban or Fellowship for any loss which they might suffer. On 19 October 1971, this claim was dismissed before the case came on for trial, without prejudice.

Ultimately, the court, having determined that the Suburban trust was a purchase money trust; that the

---

1. The action had originally been instituted on 22 August 1969.

absence of the affidavit of disbursement was inadvertent, and was therefore corrected by the curative act, Code (1957, 1966 Repl. Vol., 1971 Cum. Supp.) Art. 21, § 99, and that there was no evidence that a fraud had been worked on the Hostetters, entered an order on 28 July 1972 holding that the Suburban trust was valid and that the Hostetter trust was subordinated to it by the subordination agreement.

The Dryfooses then moved to set aside this order, on the ground that the subordination of the lien of their deed of trust to Hostetter to that of B. A.'s to Suburban amounted to an invalid application of the curative act, and would deprive them and the Hostetters of vested rights which both had in the property.

From an order entered on 24 August denying this motion and from the order of 28 July, the Dryfooses have appealed. The Hostetters have appealed from the order entered in July granting validity and priority to the Suburban trust.

The Dryfooses rest their case on three arguments:

1. The absence of the affidavit of disbursement renders the Suburban trust invalid, an invalidity which cannot be corrected by the curative act, without unconstitutionally disturbing rights which had become vested;

2. It was error to rule that the Hostetters and the Dryfooses had the burden of proving that the omission of the affidavit of disbursement was not inadvertent; and

3. Without committing perjury, Suburban could not make an affidavit of disbursement when $50,000.00 had been borrowed, but only $30,625.00 had been disbursed and then two days after the Suburban deed of trust was executed.

The Hostetters, in their cross appeal, argue:

1. A subordination agreement executed on 10 February 1969 prior to the preparation of a deed of trust on 12 February 1969 is defective on its face.

2. It was error not to find that the subordination agreement was procured by fraud.

Because we regard the Dryfooses' first contention, albeit in somewhat modified form, as dispositive of the case, we need not reach the other points.

For more than a century, Maryland has conditioned the validity of a mortgage as to third parties without notice upon the making of an affidavit of consideration by the party secured, *see* Ch. 154, § 112 of the Laws of 1856. By Ch. 652 of the Laws of 1963, Code (1957, 1966 Repl. Vol.) Art. 21, § 30, the requirement was specifically extended to deeds of trust as well as mortgages, *Weidemeyer v. Brekke,* 248 Md. 175, 235 A. 2d 718 (1967). Suburban met this requirement, despite the fact that B. A. received less than the full amount of the note which it promised to pay, *see Govane Bldg. Co. v. Sun Mortgage Co.,* 156 Md. 401, 144 A. 486 (1929).

By Ch. 718 of the Laws of 1968, effective 1 July 1968, Code (1957, 1966 Repl. Vol., 1971 Cum. Supp.), Art. 21, § 30 was amended, with the result that at the time the Dryfooses sold to B. A., there was required not only an affidavit of consideration to import validity to a mortgage or deed of trust, § 30 (a), but an affidavit of disbursement to import validity to a purchase money deed of trust given to anyone other than the seller, § 30 (b).

The two provisions are quoted below, because we regard the difference in language as critical in this case:

"(a) No mortgage or deed of trust *shall be valid except as between the parties thereto,* unless there be endorsed thereon an oath or affirmation of the mortgagee or the party secured by a deed of trust that the consideration recited in said mortgage or deed of trust is true and bona fide as therein set forth. (emphasis supplied)

"(b) No purchase money deed of trust involving land any part of which is situated in

Maryland, *shall be valid either as between the parties or as to any third parties* unless such deed of trust contains or has endorsed upon it at a time prior to recordation, the oath or affirmation of the party secured by such deed of trust stating that the amount of the loan which said deed of trust has been given to secure was paid over and disbursed by the party secured by the deed of trust to either the borrower or the person responsible for disbursement of funds in the closing transaction or their respective agent at a time no later than the final and complete execution of the deed of trust, provided, however, that this subsection shall not apply where a deed of trust is given to a seller in a transaction in order to secure payment to him of all or part of the purchase price of said property." (emphasis supplied)

It will be noted that § 30 (a) provides that a mortgage or deed of trust remains valid as between the parties, even though an affidavit of consideration be lacking. In *Pagenhardt v. Walsh,* 250 Md. 333, 243 A. 2d 494 (1968), we reviewed the cases and concluded that substantial compliance with the requirement that an affidavit of consideration be endorsed on a mortgage was sufficient if the transaction were entered into in good faith, but that where the affidavit was deficient in form, the mortgage was a nullity, except as between the parties and as to others having actual notice. As a consequence, under such circumstances, a mortgage is not absolutely void, but is given effect as an equitable mortgage as between the parties and as to those having actual notice.

The absence of an affidavit of disbursement from a deed of trust, however, brings about a sharply different result. The deficient deed of trust is invalid as to the parties as well as to third persons: in other words, it is wholly void. As a consequence, had either the Dryfooses or the Hostetters (or even B. A.) sought a declaration

that the deed of trust to Suburban was of no effect, they surely would have prevailed if final judgment could have been entered before the effective date of the curative act on which the court below relied. The significance of the difference in the sanctions imposed by § 30 (a) and § 30 (b) for noncompliance will be considered hereafter.

We now turn to a consideration of the effect of the curative act. The sale to B. A. took place on 14 February 1969; the Dryfooses' amended bill was filed on 2 July 1970; and the curative act on which Suburban and Fellowship rely, Ch. 479 of the Laws of 1971, Code (1957, 1966 Repl. Vol., 1971 Cum. Supp.) Art. 21, § 99, became effective 1 July 1971, nearly a year after the filing of the amended bill but prior to the entry of the orders of 28 July 1972 and 24 August 1972, from which these appeals were taken.

Curative acts have been enacted at virtually every session of the General Assembly commencing with Ch. 208 of the Laws of 1858. They have as their general purpose the validation of conveyances which might otherwise have been challenged because of some deficiency in form or content. Although curative acts may be broadly characterized as being retroactive or retrospective in their operation, they are generally sustained on the theory that whatever a sovereign power may authorize in prospect, it may adopt and validate in retrospect, so long as there is no interference with vested rights or contractual obligations, *Leonardo v. Board of County Comm'rs of St. Mary's County*, 214 Md. 287, 301-02, 134 A. 2d 284 (1957) ; *cert. denied*, 355 U. S. 906, 78 S. Ct. 332, 2 L.Ed.2d 260; *reh. denied*, 355 U. S. 967, 78 S. Ct. 534, 2 L.Ed.2d 543; 2 Cooley, *Constitutional Limitations* at 775, and cases collected at 776, Note 1 (8th ed. 1927) ; 2 Sutherland, *Statutory Construction* § 2214 at 137 (3d ed. 1943).

Perhaps the most succinct summary of the criteria against which the validity of a curative act is tested is found in Judge Murrah's statement for the 10th Circuit

in *Goddard v. Frazier*, 156 F. 2d 938, 941-42 (10th Cir. 1946), *cert. denied*, 329 U. S. 765, 67 S. Ct. 124, 91 L. Ed. 659:

"As a general proposition, it is said that a jurisdictional defect in a judgment cannot be cured by retroactive legislation without denial of due process of law, while retroactive legislation designed to cure non-jurisdictional or modal defects is within the constitutional power of the legislature. [citing cases]; Cooley on Constitutional Limitations, 8th Ed., P. 776; Sutherland Statutory Construction, 3rd Ed., Sec. 2206. The doctrine is based upon the sound principle that curative acts cannot cure want of authority to act at all, or validate or infuse life into utterly void proceedings without taking the property of one person and transferring it to another in violation of due process. [citing cases] The defect is not incurable unless the remedy violates due process. What constitutes a jurisdictional defect in terms of due process of law must necessarily be resolved by resort to the fundamental principles of due process itself, bearing in mind that the concept is indefinable by legalistic formulae, but is founded upon considerations of fundamental fairness. Betts v. Brady, 316 U. S. 455, 62 S. Ct. 1252, 86 L. Ed. 1595; Willoughby on Constitution, 2nd Ed., p. 1681.

"In search of a ready test for determining the validity of a curative statute, the courts have established the rule that 'a legislature may validate by subsequent act anything it might have authorized previously or may make immaterial anything it might have omitted in the original act.' Sutherland, supra, sec. 2206. Mr. Cooley states the rule thus: 'If the thing wanting or which shall fail to be done and which con-

stitutes the defect in a proceedings is something the necessity for which the legislature might have dispensed with by prior statute, then it is not beyond the power of the legislature to dispense with it by subsequent statute'. Cooley, supra, p. 775. The United States Supreme Court quoted the foregoing statement by Mr. Cooley in the very early case of Mattingly v. District of Columbia, 97 U. S. 687, 24 L. Ed. 1098, with the further statement that the Congress might cure irregularities and confirm proceedings which, without the confirmation, would be void because unauthorized, provided such confirmation does not interfere with intervening rights. See also McFaddin v. Evans-Snider-Buel Co., 185 U. S. 505, 22 S. Ct. 758, 46 L. Ed. 1012.

\* \* \*

"Courts do not regard rights as constitutionally protected which are contrary to the equity and justice of the case. Cooley, supra, p. 784. And when the intent of the curative act is to achieve a result which will be recognized in a court of equity, a greater presumption of validity attaches to it and should be liberally construed to effectuate the salutary purpose. See Sutherland, supra, Sec. 2214."

For illuminating analysis and criticism of the approach taken by courts in the determination of the constitutionality of curative statutes, see Greenblatt, *Judicial Limitations on Retroactive Civil Legislation,* 51 Nw. U. L. Rev. 540 (1956) ; Smith, *Retroactive Laws and Vested Rights,* 6 Texas L. Rev. 409 (1928) ; Smith, *Retroactive Laws and Vested Rights,* 5 Texas L. Rev. (1927) ; Comment, *The Variable Quality of a Vested Right,* 34 Yale L. J. 303 (1925).

What is curious about Ch. 479 of the Laws of 1971 is that for the first time the General Assembly endeavored to deal with affidavits of disbursement:

". . . or deeds of trust executed and recorded prior to July 1, 1971, in which the affidavit of disbursement of loan was not in the prescribed form, or *was inadvertently omitted* . . . shall be and the same are hereby made valid, to all intents and purposes as if the conveyances and agreements had been acknowledged, certified to, witnessed and sealed according to law; providing the said deeds, mortgages, bonds of conveyances, bills of sale and other conveyances and agreements are in other respects in conformity with the laws; provided, further, that nothing in this section shall affect the interest of bona fide purchasers or creditors without notice, who may have become so previous to July 1, 1971." (emphasis supplied)

More curious still is the circumstance that the Legislature, which in previous curative acts had validated instruments bearing acknowledgments and affidavits which were defective in form, this time sought to cure an invalidity which stemmed from the complete absence of an affidavit, if "inadvertent."

We regard the application of the curative statute, under the facts of this case, as constitutionally impermissible. The legislative intent, in enacting Art. 21, § 30 (b) is abundantly clear: a deed of trust which lacked an affidavit of disbursement was to be regarded as void, not only as to third parties, but as between the parties themselves. From 14 February 1969 until 1 July 1971, the lien which the Suburban deed of trust purported to create was of no effect. During this period, the Hostetters were secured by the senior incumbrance on the property, the Dryfooses, by a lien junior to the Hostetters'. They surely acquired a vested right in the status which each had. To give validity to the curative act would put the Hostetters second in order of priority, subject to a senior encumbrance of $50,000.00 and put the Dryfooses in an equivocal position, depending on whether their

$18,000.00 trust was properly recorded before Suburban's so that they would be subject only to the $40,-000.00 Hostetter trust, or to prior liens aggregating $90,000.00.

We willingly grant that the Legislature, having chosen to impose the requirement of an affidavit of disbursement, had the power to repeal the statute prospectively. What it could not do, however, once it had imposed the requirement, was to validate a deed of trust which was a nullity when made, to the prejudice of the Dryfooses and the Hostetters. To reach any other result would be tantamount to saying that the Legislature could take a property interest from one person and vest it in another, which cannot be done by statute, *Association of Taxi Oprs. v. Yellow Cab Co.*, 198 Md. 181, 192, 82 A. 2d 106 (1951) ; *Queen v. Anderson*, 191 Md. 522, 532, 62 A. 2d 612 (1948). As a consequence, if the saving clause of a curative statute is not broad enough to encompass due process guaranties, the act must be held invalid to the extent that these guaranties are violated.

In *Grove v. Todd*, 41 Md. 633 (1875), Benjamin Todd and Ruth Todd, his wife, joined in a deed conveying certain land in Frederick County. At the time of the execution of the deed, a wife could release her inchoate right of dower only by a deed acknowledged before a judge or justice of the county within which the real estate lay or of the county in which the grantor might be. The deed which the Todds executed purported to have been executed and acknowledged in Frederick County before a justice of the peace of that county but was in fact executed and acknowledged in Carroll County before a justice of the peace of Frederick County.

Subsequent to Benjamin's death, when his wife's inchoate right had become choate, a curative act was passed which would have validated an acknowledgment taken in one county by a justice of the peace of another county. Our predecessors held that the curative act could not validate Mrs. Todd's invalid acknowledgment:

"The deed being utterly void and without effect as to her estate, if she is now divested of her right of dower, it is by force of the statute and not of the deed; the statute operating through the form of the otherwise void deed to transfer the estate. To concede to the Legislature the power, by retroactive legislation, adopted without the consent of the party to be affected, to accomplish such a result, is at once to concede to it the power to divest the rights of property and transfer them, without the forms of law, upon any notion of right or justice that the Legislature may think proper to adopt:—a concession that can never be made in a government where the rights of property do not depend upon the mere will of the Legislature, and which professes to maintain a regular system of laws for the protection of the rights of property of its citizens." 41 Md. at 642

The results reached in cases such as *State v. Norwood,* 12 Md. 195 (1858) ; *Atwell v. Grant,* 11 Md. 101 (1857) and *Baugher v. Nelson,* 9 Gill 299 (1850) may readily be distinguished on the ground that a failure to give retroactive effect to a statute would relieve an obligor of an obligation which he had voluntarily assumed. By analogy between these cases and that before us, it is clear that the effect of the curative act is to validate the obligation which B. A. voluntarily undertook as respect Suburban and its assignees. *Compare Seese v. Bethlehem Steel Corp.,* 168 F. 2d 58, 64 (4th Cir. 1948) : "[B]ut the inquiry is, not whether vested rights or rights under existing contracts have been interfered with, but whether or not the power has been exercised arbitrarily or unreasonably under the circumstances."

In *Booth v. Hairston,* 193 N. C. 278, 136 S. E. 879 (1927) ; *on rehearing,* 195 N. C. 8, 141 S. E. 480 (1928), the statute there involved provided that a deed of gift, if not recorded within two years from the date thereof,

would be void. The problem posed by the case was whether a curative statute which attempted to extend the time for recording after the two-year period had expired could constitutionally validate the deed in the face of the fact that the grantor had made other disposition of the property. The Court said:

". . . The statute (C.S. § 3315) provides, in substance, that a deed of gift, if not proven in due form and registered within two years after the making thereof, shall be void."

\* \* \*

". . . The bald question of law involved is whether or not the General Assembly can ratify a void deed. When the deed of gift in this case was given, the law required that it be registered within two years, and it went further, and pronounced the instrument dead after the lapse of two years. The power of the Legislature to cure defective certificates or acknowledgments or probates or registration is undoubted, and has been recognized, approved, and set in the law in hundreds of cases; but the power to cure a crippled instrument, having at least a spark of legal life, does not extend to raising a legal corpse from the dead."

To the same effect *see Ramey v. Pyles*, 182 Ark. 320, 31 S.W.2d 533 (1930); *McLain v. Oklahoma Cotton Growers' Ass'n*, 125 Okla. 264, 258 P. 269 (1927); *Denny v. McCown*, 34 Ore. 47, 54 P. 952 (1898).

Suburban and Fellowship make much of the fact that the constitutionality of the curative act was not raised in the initial pleadings and was first raised, they say, on August 21, 1972, just prior to the final disposition of the case. There is a two-fold answer to this contention. First, since the case was at issue some months before the curative act became effective on 1 July 1971, the issue could not have been raised initially. Second, the application and effect of the curative act had been the subject

of motions filed in the case by Suburban and Fellowship on 30 December 1971 and by the Hostetters on 10 January 1972. The issue was again raised in the court's own order of 17 February 1972, setting the case for reargument. As we have attempted to point out, the issue is not really that of the constitutionality *vel non* of the curative act but the issue is, rather, whether the application of the act in a fashion which would disturb the vested rights of the Dryfooses and the Hostetters is constitutionally impermissible under the facts of this case, as a denial of due process.[2] It seems to us that this question was raised in timely fashion and is certainly not being posed for the first time on this appeal.

The lower court concluded that B. A.'s deed of trust was a purchase money trust, even though only $22,000.00 of a $50,000.00 borrowing was actually used in the purchase of the Dryfoos property, relying on *Gay Investment Co. v. Comi*, 230 Md. 433, 438, 187 A. 2d 463 (1963), *but see In re Shapiro*, 35 F. Supp. 579 (D. Md. 1940), *aff'd Sandler v. Freeny*, 120 F. 2d 881 (4th Cir. 1941). However, the deed of trust which B. A. executed was called a purchase money deed; no documentary stamps were affixed as is required by Code (1957, 1969 Repl. Vol.) Art. 81, § 277 (a) when the borrowing is for other than purchase money purposes, and it would seem that under such circumstances, B. A. might well be estopped from taking a contrary position.[3]

---

**2.** Hostetter testified that the subrogation agreement had been presented to him for signature by two men whom he did not know, one of whom he later identified as Raymond Roy, president of B. A., Inc. The record discloses that at least by August 1971, Roy was confined at Allenwood Federal Prison Farm.

**3.** It is interesting to note that Art. 21, §§ 30 (a) and (b) were amended and re-enacted by Ch. 349, § 1 of the Laws of 1972, became effective on 1 January 1973, and are now incorporated in Code (1957, 1966 Repl. Vol., 1972 Interim Supp.) Art. 21, § 4-106. Subsection 4-106 (b) which made affidavits of disbursement applicable to both mortgages and deeds of trust now provides that "This affidavit shall be required for only that part of the loan that is purchase money and in the event the requirements of this subsection 4-106 (b) are not satisfied the mortgage or deed of trust shall be invalid only to the extent of the part of the loan that was purchase money."

In short, we conclude that the court below erred in not entering a decree holding that B. A.'s deed of trust to Suburban was void and of no effect as regards both the Hostetters and the Dryfooses, and further, that the agreement subordinating the Hostetter lien to what was at the time the lien of an invalid trust was completely nugatory.

> *Order reversed, case remanded for the entry of a decree conformable to the views expressed in this opinion. Costs below and on appeal to be paid by Suburban Home Investment Corporation.*